STATE of Utah, Plaintiff and Appellee,

v.

Joe F. JIRON, Defendant and Appellant.

No. 930640–CA.

Court of Appeals of Utah.

Sept. 27, 1994.

---

See also 866 P.2d 1249.

Steven B. Killpack, Provo, for appellant.

Jan Graham and Kris C. Leonard, Salt Lake City, for appellee.

Before BILLINGS, JACKSON and ORME, JJ.

JACKSON, Judge:

Joe F. Jiron (Jiron) appeals his conviction of murder, a first degree felony, in violation of Utah Code Ann. § 76-5-201 and § 76-5-203 (Supp.1993) and arson, a third degree felony, in violation of Utah Code Ann. § 76-6-102 (1990). We affirm.

## FACTS

Jiron and Shelly Jiron (Shelly) were married as teenagers and had two children. They divorced after five years of marriage in 1990. However, they continued seeing each other throughout their separation and Jiron's remarriage in 1990. On December 16, 1992, Jiron left for work as usual but never arrived. He returned home an hour later, acting strange and unfriendly. Jiron had his current wife find a pencil and paper and dictated to whom his money and tools should be given and told her that she could take the house and everything in it. He told his wife that he "was tired of life" and that he "wanted to quit." He then left and his wife later called several members of Jiron's family, asking if they had seen Jiron and telling them that he may be suicidal. That evening she called the Salt Lake County Sheriff's Office to report him missing. She explained that he may be suicidal and that he may have taken sleeping pills with him.

Jiron left his home and called Shelly at her home in Provo from a phone booth in Springville, telling her that his car was out of gas and he needed help. Jiron then withdrew money from a bank in Springville and purchased a gas can in Spanish Fork, despite the fact that there was a gas can in the trunk of his car, which had been given to him two months earlier. Jiron then withdrew money from a bank in Payson. At some point, Shelly met Jiron. That afternoon, she called Jiron's sister and asked if she would watch her children. She said she was going on a "hot date with some Mexican," referring to Jiron. Shelly and Jiron took Shelly's car to her mother's home in Orem to pick up the children. While there, Shelly's mother gave her an unopened letter and one or two red roses left there the previous day by Shelly's current boyfriend. Shelly and Jiron then took the children to Jiron's sister's home and

drove to Wendover, Nevada. The next morning, December 17, Shelly called Jiron's sister to let her know where they were and that they would be coming home after breakfast.

Shelly and Jiron pulled off the highway about two and one-half hours from Wendover, and stopped at a secluded spot on Soldier's Pass Road. Sometime later, Shelly's car left State Road 68, crashed through a barbed wire fence, traveled 750 feet through a rutted field, and came to rest at the top of a gully west of Utah Lake.

At 7:00 p.m. on December 17, an individual named Mr. Jensen was driving from work in Lehi to his home in Goshen on State Road 68 when he saw the lights of the car and stopped to investigate. He discovered Shelly's nude body on the front floor of the passenger's side and found Jiron unconscious in the driver's seat. Jensen's wife summoned help while Jensen attempted to aid the couple. Jensen found an open gas can upright under Shelly's feet.

Police and emergency medical technicians (EMTs) began arriving around 7:30 p.m. The EMTs found no pulse on Shelly and had difficulty positioning her on the backboard due to the stiffness of her body. The hair on the back of Shelly's head had been burned and some of her skin sloughed off as they moved her from the car. Jiron began to regain consciousness as the EMTs moved him from the car. He was "quite combative" and demanded that they let him die.

Police and fire investigators concluded that gasoline had been poured inside Shelly's car and that the gas vapors had ignited a flash fire before the car came to a stop at the gully. All the car windows were rolled up and had a film of soot on the inside. Because of limited oxygen in the car, the fire lasted less than one minute, and burned only from the dashboard to the top of the car. The investigation eliminated the possibility that gas was spilled inside the car by accident. A book of ten burned matches and two individual burned matches were found on the floor of the driver's side. Two burned matches and one unburned match were found on the driver's seat.

An autopsy was performed on Shelly's body the next morning and the medical examiner determined that Shelly died of asphyxiation prior to the fire. He noted that if Shelly had been alive during the fire, he would have found evidence of heated air traveling through her airways, higher levels of carbon monoxide in her blood, and more ash or soot in her lungs and throat. The examiner also found several injuries which were inflicted no more than four hours before Shelly died. Her injuries included hemorrhaging on the inside of her eyelids due to a low oxygen supply. There was also evidence of a blow with a blunt object on the lower part of the back of her neck. The injuries possibly resulted in incapacitation or disability. He also noted several superficial cuts and blood smears near Shelly's anus which resulted from an object applied with force rather than penile penetration.

Jiron was charged with murder and arson. After a seven-day jury trial, beginning September 29, 1992, a jury found Jiron guilty as charged. Jiron was sentenced on November 20, 1992, and he filed a motion for new trial ten days later. The trial court denied the motion. Jiron now appeals from his convictions and the denial of his motion for new trial.

## ISSUES

Jiron asserts: (1) that the trial court improperly denied his motion for new trial based on newly discovered evidence; (2) that the trial court improperly admitted a photograph of Shelly's anal injuries into evidence; and (3) there was insufficient evidence to support the jury's verdict.

## ANALYSIS

### Newly Discovered Evidence

At trial, Jiron testified that he only remembered "a little" of what happened the week before the accident and nothing at all about what happened on and after the day of the accident. The prosecution and defense stipulated during trial that if Dr. Jeffrey Stoffal, the Director of the University of Utah Burn Center was called to testify, he would testify as to the following: (1) Jiron,

was treated with medication which has a common side effect of producing memory loss; (2) Jiron sustained a concussion and that memory loss would be expected with that injury; and (3) the traumatic nature and extent of the injuries suffered by Jiron would contribute to memory loss.

Jiron was sentenced on November 20, 1992. On November 30, 1992, he filed a motion for new trial based upon prosecutorial misconduct. In February 1993, Jiron filed an amended memorandum to his motion for new trial to include the claim that he had partially regained his memory. On May 10, 1993, Jiron filed with the trial court a nine page affidavit detailing facts that he had previously been unable to remember. The trial court denied the motion for new trial.

■ A trial court has a wide range of discretion in determining whether newly discovered evidence entitles a litigant to a new trial. *State v. Goddard*, 871 P.2d 540, 545 (Utah 1994); *State v. James*, 819 P.2d 781, 793 (Utah 1991). We will uphold the trial court's decision if it is within the limits of reasonability. *Goddard*, 871 P.2d at 545; *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992). The new evidence must meet all three of the following criteria to constitute grounds for a new trial: (1) it must be such as could not with reasonable diligence have been discovered and produced at the trial; (2) it must not be merely cumulative; and (3) it must be such as to render a different result probable on the retrial of the case. *Goddard*, 871 P.2d at 545; *accord James*, 819 P.2d at 793.

■ We believe the trial court did not abuse its discretion in denying the motion for new trial because Jiron failed to show that the newly discovered evidence could not, with reasonable diligence, have been discovered and produced at trial.

■ We recognize that genuine amnesia can make evidence unavailable at trial and thus, regained memory can constitute newly discovered evidence. *See United States v.*

*Bourchier*, 17 C.M.R. 15, 20, 1954 WL 2578 (C.M.A.1954). However, amnesia is easy to feign and hard to disprove. Moreover, even if amnesia is genuine at trial, a convicted defendant "will, of course, possess every prompting—both conscious and subconscious—to 'reconstruct' the forgotten events in a manner favorable to himself." *Id.*

■ In order to show due diligence in discovering the forgotten facts, Jiron had the burden to establish that he was in fact suffering from amnesia and that his memory would not return except through the passage of time. He had to show that medicine, hypnosis, or other measures could not hasten the recall of the forgotten evidence such that he could have more fully testified at trial. *See State v. Lynne*, 376 N.W.2d 533, 535 (Minn. Ct.App.1985). In *Lynne*, the defendant made a motion for new trial on the ground that he had recovered his memory. The appellate court upheld the trial court's denial of the motion because "appellant cites no credible medical evidence that he ever had amnesia. He merely submits affidavits by two physicians indicating that amnesia and subsequent recovery of memory is possible following an auto accident. There is no evidence that [the defendant] was ever examined or treated for amnesia." *Id.* Similarly, in our case, Jiron provides no credible medical evidence that he actually had amnesia. As in *Lynne*, Jiron merely stipulated to the effect that memory loss is possible following such an accident and as a side effect of his prescribed medicine.

■ Because Jiron failed to provide any evidence that he was in fact suffering from amnesia and that his memory would not return except through the passage of time, he has failed to demonstrate that he could not have discovered the evidence and produced it at trial with reasonable diligence. Accordingly, the trial court did not abuse its discretion in denying Jiron's motion for new trial.[1]

1. Although the trial court denied the motion only on the ground that the evidence was merely cumulative and that no different result would have been reached on a retrial, we may affirm on any appropriate ground. *State v. Shipler*, 869 P.2d 968, 969 (Utah App.1994); *see State v. Bryan*, 709 P.2d 257, 260 (Utah 1985).

## Photograph of Shelly's Anal Injuries

Jiron alleges that the trial court erred in admitting a photograph of Shelly's anal injuries. Utah Rule of Evidence 403, provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ If the evidence has an unusually strong propensity to unfairly prejudice, inflame or mislead a jury, we require a showing of unusual probative value before it is admissible under Rule 403. *State v. Dunn,* 850 P.2d 1201, 1221–22 (Utah 1993). Gruesome photographs fit within the category of evidence subject to this requirement. *Id.* at 1222; *State v. Lafferty,* 749 P.2d 1239, 1256 (Utah 1988), *cert. denied,* —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992).

■ Whether a photograph is gruesome is a question of law, reviewed for correctness. *Dunn,* 850 P.2d at 1222 n. 22. While some would presume that a photograph depicting anal injuries would necessarily be "gruesome," a photograph is not gruesome merely because it depicts injury to a private area of a person's body. *See State v. Parsons,* 380 S.E.2d 223, 228 (W.Va.1989) (photo depicting injury to victim's anus found not gruesome). Practically all homicide photos are unpleasant to view and photos of private parts may be embarrassing, but that does not render them legally gruesome.

Utah courts have discussed whether photographs are gruesome under Rule 403. *See, e.g., Dunn,* 850 P.2d at 1222 (finding photograph not gruesome because it revealed only decedent's back, part of arm, and blood stained clothing, not showing any wounds, mutilation, or deformity caused by shooting); *State v. Allen,* 839 P.2d 291, 303 (Utah 1992) (determining photographs not gruesome because they did not depict open wounds or excessive blood, but rather showed intact body of victim with visible injuries consisting of bruising, fingernail marks, and bald spot on head); *State v. Cobb,* 774 P.2d 1123, 1125 (Utah 1989) (finding photo not gruesome because photograph was dull in color, body had been washed and sutured, only area between thigh and chest where two wounds were inflicted was exposed, and victim's head and face were not shown); *State v. Bishop,* 753 P.2d 439, 476–77 (Utah 1988) (determining that photograph showing hole in child's skull and pair of tongs pulling skin away to reveal brain cavity "had great potential for unfairly prejudicing defendant"); *Lafferty,* 749 P.2d at 1257 (finding photographs of baby's repositioned body to expose gaping neck and blood covered face, mother's bloody corpse in pool of blood on kitchen floor to be "quite gruesome"); *State v. Cloud,* 722 P.2d 750, 753 (Utah 1986) (finding color photos of victim lying both face up and face down in pool of blood were "very graphic and gruesome").

While these cases have not attempted to define what is and is not gruesome, the word connotes something much stronger than being offensive, embarrassing, or graphic. Something is gruesome only if it "inspir[es] horror or repulsion." *Webster's Third New International Dictionary* 1005 (1986). Synonyms include "grisly" and "hideous." *See id.*

■ The photograph in this case reveals Shelly's anal area and associated injuries. The photo was discreetly cropped to show only the part of the body at issue. The restricted view of the body greatly minimizes the photograph's visual impact. *See Dunn,* 850 P.2d at 1222. Furthermore, the photographed area was clean and free of blood. Thus, the photograph is clearly not gruesome under the criteria gleaned from the foregoing cases.

Because the photograph is not gruesome, the usual Rule 403 analysis applies, and a presumption exists that the evidence is admissible. *See id.* at 1221–22. Thus, Jiron must overcome Rule 403's presumption in favor of admitting the proffered evidence. *See id.* at 1222. The photograph was probative in helping the jury resolve whether the wounds occurred by a violent act, during consensual sex, or by accident. The photo was also probative in helping the jury determine whether the nature of the wounds suggested that Jiron intended to kill Shelly. Jiron has failed to show that the photo-

graph's probative value is substantially outweighed by the danger of unfair prejudice. Accordingly, we find the trial court did not exceed the bounds of reasonability in finding that the photograph's potential for unfair prejudice did not outweigh its probative value.

### Sufficiency of Evidence

 Jiron also claims there is insufficient evidence to support his convictions of murder and arson. In reviewing the sufficiency of the evidence, we afford great deference to the jury verdict. *State v. Goddard,* 871 P.2d 540, 543 (Utah 1994); *State v. James,* 819 P.2d 781, 784–85 (Utah 1991). "Where there is any evidence, including reasonable inferences that can be drawn from it, from which findings of all the elements of the crime can be made beyond a reasonable doubt, our inquiry is complete and we will sustain the verdict." *Goddard,* 871 P.2d at 543 (quoting *State v. Gardner,* 789 P.2d 273, 285 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990)). Reversal is warranted only when the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime. *Goddard,* 871 P.2d at 543.

After a careful review of the evidence, we conclude that there is evidence from which all the elements of the crimes can be established beyond a reasonable doubt. Accordingly, the jury verdict is supported by substantial evidence. Further, we have reviewed the remaining issues raised by Jiron and conclude they are without merit. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989) (appellate court need not address every argument, issue or claim raised on appeal).

### CONCLUSION

The trial court did not abuse its discretion in denying Jiron's motion for new trial based on newly discovered evidence because Jiron did not meet his burden of showing that he had amnesia and could not discover the evidence other than through the passage of time. Further, the trial court's decision to admit the photograph of Shelly's anal injuries into evidence was not erroneous because the

photo was not gruesome and its probative value was not substantially outweighed by the danger of unfair prejudice. We also conclude that sufficient evidence was presented to support the jury's verdict. Accordingly, we affirm.

ORME, J., concurs.

BILLINGS, J., concurs in the result.